**Barry Lee JANVRIN, Appellant,**

v.

**Charles HAUGH, Warden, Appellee.**

**No. 53734.**

Supreme Court of Iowa.

Oct. 14, 1969.

Benjamin W. Blackstock, Cedar Rapids, for appellant.

Richard C. Turner, Atty. Gen., William A. Claerhout, Asst. Atty. Gen., and Robert Story, County Atty., for appellee.

SNELL, Justice.

This is an appeal from an order of the district court annulling a writ of habeas corpus sought by an inmate of the reformatory at Anamosa.

Defendant was and is represented by counsel.

In the district court there was a full evidentiary hearing on the petition for relief by habeas corpus.

Appellant alleges three errors relied on for reversal. They relate to the proceedings leading to his plea of guilty to Robbery with Aggravation in Polk County. He claims denial of due process, denial of effective representation of counsel and improperly induced plea of guilty.

I. Consideration of the problems requires some review of the evidence and record in the habeas corpus trial. Petitioner must establish his claims by a preponderance of the evidence.

Our review is not de novo. The findings of fact by the trial court (not involving child custody) are binding on us if supported by substantial evidence. Larson v. Bennett, Iowa, 160 N.W.2d 303, 307 and authorities cited therein, and Hawkins v. Bennett, Iowa, 160 N.W.2d 487, 489.

II. Original judgment and sentence of appellant-petitioner in Polk County was on July 15, 1968.

Petition for writ of habeas corpus attacking the procedure in Polk County was filed in Jones County September 2, 1968.

Section 793.1, Code of Iowa, provides that the mode of review in the supreme court in a criminal case is by appeal.

Section 793.2, Code of Iowa, provides for appeal from final judgment within 60 days.

When petition for writ of habeas corpus was filed the time for appeal from final judgment had not expired. Why petitioner resorted to habeas corpus rather than appeal does not appear.

Habeas corpus is not a substitute for appeal. Farrant v. Bennett, 255 Iowa 704, 706, 123 N.W.2d 888, Hoskins v. Bennett, 256 Iowa 1370, 1377, 131 N.W.2d 510, Ford v. State, 258 Iowa 137, 139, 138 N.W.2d 116, and Larson v. Bennett, supra, 160 N.W.2d loc. cit. 306.

III. While this case might be decided on other grounds, a challenge to due process cannot be brushed aside as immaterial. While the end does not justify the means, the rules should be the vehicle for justice and not an end in themselves. The background in our problem becomes important.

From the evidence introduced at the habeas corpus hearing it appears that petitioner, together with three accomplices, was indicted in Polk County for Robbery with Aggravation. He was represented by privately retained and paid counsel. His counsel was experienced and admittedly competent. When employed by petitioner he was also, by previous appointment of court,

representing the codefendants. We quote from petitioner's brief:

"The attorney in this case is certainly not incompetent but was simply placed in such a position by representing all four codefendants that he could not effectively represent the appellant. It is not the purpose of this appellant—or his attorney in this appeal—to criticize anyone."

The director of entry at the men's reformatory identified the Mittimus committing petitioner and testified that he was in custody pursuant thereto.

It was agreed that there were four defendants in one criminal case, all charged with the same crime and all represented by the same counsel. They were not tried jointly nor were their cases disposed of at the same time. The record does not show that the four cases were disposed of before the same trial judge.

George Hobbs, one of the codefendants, pleaded not guilty, was found guilty by a jury of robbery with aggravation and sentenced to 25 years imprisonment. Thereafter, petitioner pleaded guilty and received the same sentence.

A month later Michael Hobbs and Sharon Hobbs (wife of George), who were apparently accomplices but against whom there was no evidence of any overt act in actual participation of the robbery, having previously pleaded guilty to robbery, were respectively sentenced to not more than 10 years imprisonment. In each case the sentence was suspended and probation granted during good behavior. Each defendant was placed under the supervision of the Bureau of Adult Corrections Services pursuant to the provisions of section 247.20, Code of Iowa.

During the habeas corpus hearing petitioner testified:

"There were other persons arrested with me on that charge of robbery with aggravation. They were George Hobbs, Sharon Hobbs, and Michael Hobbs. I was repre-

sented by an attorney on the prosecution of this charge. That attorney was Allen Donielson. Based upon my personal knowledge, the same attorney represented all three of my co-defendants. * * * Trial was held on behalf of George Hobbs. The attorney for George Hobbs was court appointed, to my personal knowledge. Jury trial was not held for me by Mr. Donielson. From my personal knowledge I know what the sentences were for the other three defendants. George Hobbs got 25 years in the Men's Reformatory, and Sharon and Michael got 10 years with a 2 year bench parole. [Note: This was not in accord with the record]. Mr. Donielson did not at any time during his conversations with me, or conversations with the court, or any other person that I ever heard his conversation with, discuss any conflict of interest representing me or the other three defendants at the same time. He thought he might be able to get Michael and Sharon's charges broken down to a lesser charge. I believe that he told me this sometime in May. Mr. Donielson said that since this was my first offense that he would try to work for, to try to get a bench parole. I was told by my attorney that if I entered a plea of guilty, I would serve less time for being eligible for parole than I would if I was convicted after a trial. * * *

"I did have some conversations with my attorney. I talked to Mr. Donielson around five times. I believe it was about 5 or 6. As a matter of fact, Mr. Donielson was employed by me privately. He was the attorney of my choice. * * * When I alleged in my petition that I entered my plea under duress, I meant that I was told I'd do less time, if pleading guilty, before parole than if I had a jury trial and was convicted. My lawyer told me that. * * * My attorney did tell me that the policy of the Polk County Court was that in any crime or violence particularly, Robbery with Aggravation, that there was no parole. He told me that more than once. George Hobbs was convicted, to my knowledge, in a jury trial. He received the same sentence that I did. I did not testify at his

trial. * * * He was court appointed, and when I went to talk to him he told me that he wouldn't be able to handle my case unless I hired him on a private basis, which I did. * * *

"At the time I retained Mr. Donielson privately, I was aware that any other attorney could be retained. * * *"

As our review requires determination of the sufficiency of the evidence to support the trial court's determination, we quote at length. Allen Donielson, who was counsel for petitioner in the Polk County proceedings, testified:

"Q. Now calling your attention to the Janvrin-Hobbs case, were you appointed initially to represent Mr. Janvrin? A. I was appointed for all four in the beginning. That would be Barry Janvrin, Michael Hobbs, George Hobbs and Sharon Hobbs.

"Q. All right. Now did you have certain conversations on a number of occasions with the defendant Janvrin? Yes or No. A. I did.

"Q. Can you tell the Court approximately how many times you had conversations with Mr. Janvrin? A. Would you include phone calls in there, Mr. McKeon?

"Q. Yes. A. Oh, 7 to 12 times, I would guess, in that vicinity.

"Q. Now, after talking to Mr. Janvrin did you make an investigation of his case? A. A very complete investigation.

"Q. All right. Did this also include the facts in the case of George Hobbs and Michael Hobbs and Sharon Hobbs? A. It did.

"Q. All right. Now did you try the jury case of State vs. George Hobbs? A. I did.

"Q. And who was attorney on the other side? A. Mr. Jim—James McKeon.

"Q. All right. During the course of that trial, Mr. Donielson, did the facts dis-

close that two persons entered the grocery store that was robbed? * * * A. Yes.

"Q. And were these facts established by three eye witnesses who were in the grocery store? A. Yes.

"Q. And was George Hobbs identified as one of the two men that went in the store? A. Yes.

"Q. And was Mr. Janvrin described and identified as the other man that went in the store? * * * A. Yes.

"Q. Now did the three eye witnesses testify at the George Hobbs trial as to which defendant held the gun? A. Yes.

"Q. And would you tell the Court what those witnesses testified to at George Hobbs' trial? A. Well, they testified Mr. Janvrin held the gun, and there's some conflict as to whether or not Mr. Hobbs held a gun, some said yes and some said no.

"Q. Was there any conflict at the George Hobbs trial as to whether or not Mr. Janvrin had a gun? A. No conflict.

"Q. And did you hear testimony at the George Hobbs trial as to the apprehension of Mr. Janvrin? A. Yes.

"Q. And did you hear any testimony at the George Hobbs trial concerning whether or not a weapon was found on the person of Mr. Janvrin? A. Yes.

* * * * * *

"Q. Will you tell the Court what that was. A. It was found in his boot.

"Q. Did you hear any testimony as to whether or not at the George Hobbs trial as to whether or not that was a loaded weapon with a round in the chamber? A. I did.

"Q. And will you tell the Court what that testimony was? A. The gun was loaded with one in the chamber.

"Q. All right. Mr. Donielson, did you also prior to the George Hobbs trial talk to and discuss the case with George Hobbs,

Michael Hobbs and Sharon Hobbs? A. Many times.

"Q. All right. Now as a result—one more question in regard to the George Hobbs trial. Was there any testimony at the George Hobbs trial concerning any of the eye witnesses describing or indicating any overt act on the part of Michael Hobbs and Sharon Hobbs prior to and during the commission of the robbery? A. No.

"Q. Now did you also investigate the George Hobbs case, Michael Hobbs case and the Sharon Hobbs case? A. I did.

"Q. Now based on your investigation and your conversation with these three individuals, four individuals, did you form a theory of the defense? A. I did.

"Q. And what was your theory of defense? A. Well, my strategy was that there were the four involved, all with robbery with aggravation, so I had hoped that I might be able to reduce the charge from robbery with aggravation to robbery, at least for the two that were allegedly in the car, that would be Sharon and Michael Hobbs. It was also my strategy that I should try George Hobbs before Barry Janvrin because for two reasons. One is that it would not prejudice George Hobbs' case. And if I had an opportunity to drop it down to robbery in the George Hobbs case I would have a better chance with Mr. Janvrin. I also felt that it would be of some detriment to all defendants to try the worst case first, instead of trying your best case first. So my strategy was to try George Hobbs since Polk County has a rule that robbery with aggravation there is no probation and no reduction of the sentence or no reduction in charges, so I should try to try George Hobbs first, then Barry Janvrin, and lastly Sharon Hobbs and Michael Hobbs if I had to try those cases for robbery with aggravation. But it also was my strategy that I must keep all defendants. Because in a very large community and where it's a sizeable number of crimes being committed and different

lawyers, if I didn't keep all of the defendants it would be entirely likely that Sharon or Burt Hobbs might end up testifying against Mr. Janvrin. So by carefully looking at whether or not I would be in conflict with any of the defendants, I judged not to be in any conflict, but it would be of much value if I took all cases. Now I did explain this to Mr. Janvrin at the very outset of my taking the case. I said to him two things. One, I would not take his case as an appointment because I just had so much criminal work I couldn't handle any more; if he wanted to hire me privately I would then take the case; if I took his case I would have to keep the other three cases because I did not want them to be testifying against him in a later trial. So that basically was my strategy. And I felt that it went exactly according to what I thought. If I tried George Hobbs, I could get to review all the evidence in the most favorable light I was going to see it first, and then I could prepare for Mr. Janvrin, if there was a weakness in the case. But it turned out there was no weakness in the case.

"Q. Did you also have it in your mind that had the charge been reduced on Mr. Hobbs or had he been acquitted, that it would make him available as a defense witness for Mr. Janvrin? A. That's absolutely correct. Because he's still my best witness, and I could not get Sharon or Michael Hobbs tried first. The county attorney just wouldn't go that far. But I could get George Hobbs tried first.

"Q. All right. Mr. Donielson, did you and I discuss this prior to the time of trial? A. Several times. * * *

"A. Well, I was prepared after Mr.— tried George Hobbs first, suggested to my client the best course was to plead, in the case of Mr. Janvrin. I was then prepared to try either Michael Hobbs or Sharon Hobbs. And then at that juncture, the judge having heard the evidence and so forth in the George Hobbs case, indicated to the county attorney that they might take a plea of guilty on robbery since it

was no overt act in the actual participation. * * *

"Q. Mr. Donielson, at any time in any case whatsoever, not necessarily referring to this one, have you ever indicated to a defendant that he might receive a parole on a charge of armed robbery? A. No. And I indicated at the first meeting that we had and several times that robbery with aggravation in Polk County there's no probation.

"Q. And at any time did you promise any client, including Mr. Janvrin that he might or would serve less time if he entered a plea than if he stood trial? A. I told Mr. Janvrin that it was my general opinion and the general opinion of members of the county attorney's staff and fellow criminal lawyers that this theory of rehabilitation, there was some possibility he may serve less time. But that was not the deciding factor on the guilty plea. We didn't have a single defense witness, not one.

* * * * * *

"Q. Mr. Donielson, I'll hand you Respondent's Exhibit B and ask you to examine a document contained herein entitled Waiver and Petition to Enter Plea of Guilty. Do you find that there? Do you find that signed by the defendant? A. Yes, sir.

"Q. And does there appear a space in there that he pleads guilty to the crime of what? A. Robbery with aggravation.

"Q. And on the front page does it indicate the maximum sentence? A. Yes, sir.

"Q. And does it also say that in admission of his crime he enters his plea of guilty? A. Yes, sir.

"Q. And did you indicate to him that an admission of his crime and of his responsibility and his determination, that his rehabilitation might start or will be considered to be started on a plea of guilty? A. Yes, sir.

"Q. And do you believe this to be a fact? A. I do.

"Q. Have you had conversations with persons who are in a position to know whether or not this is true? A. Those that I judge highly.

"Q. And have they indicated to you that rehabilitation starts with the acceptance or responsibility of crime? A. Yes, sir.

"Q. And do you know this to be a fact from your own experience that persons who plead guilty often times and most times are paroled at an earlier date than those who are recalcitrant and stand trial? A. That has been my opinion based on my experience.

"Q. And this was merely information that you imparted to the defendant. And did you do this in an effort to induce him to enter a plea of guilty to this crime? A. This was a very small part of our—of his plea. Our biggest one was that I had just tried George Hobbs, nothing came out of that entire case favorable to us at all. We had no defense to the case. This was the big factor in my suggestion that the plea of guilty was prudent. * * *

"Q. Mr. Donielson, in representing all four of these individuals I assume you had conversations with all four? A. Repeatedly. * * *

"Q. So I assume then from what you said then that you made use of the information that you secured from the other clients in determining what method of representation you would use in representing a particular client? A. Yes. * * *

"Q. Do you feel that your four defendants had different degrees of guilt, your four clients? A. In the interest of justice I certainly do."

The director of admissions at the reformatory testified that whether an inmate had been convicted by a jury or pleaded guilty had no effect on how soon he would be considered for parole. He then said:

"Inmates become eligible for parole the minute they come into the institution. The case worker and the Board of Parole work toward a rehabilitation of the defendant. I presume one of the things they consider is the fact that the defendant has admitted his wrong doing and has accepted his responsibility for that fact. That the ultimate aim of incarceration is rehabilitation, and that starts with the attitude the defendant has towards his participation in the individual crime. * * * Mainly the Board of Parole's attitude is that if a man has rehabilitated himself to the point where he can make it on the outside, then he gets out."

In the habeas corpus case the trial court found:

"Petitioner's counsel in the criminal proceedings in Polk County also represented three co-defendants who were charged with defendant. (Petitioner claims he was thereby deprived of effective representation of counsel. He relies on the case of State v. Karston, 247 Iowa 32, 72 N.W.2d 463.) No conflicts of interest arose in the handling of the four cases, however, and petitioner had the assistance of effective counsel.

"Petitioner's counsel told petitioner that it was his general opinion and the general opinion of members of the county attorney staff and fellow criminal lawyers that, because the board of parole considered acknowledgement of wrong-doing to be a first step toward rehabilitation, that there was some possibility that petitioner would receive parole earlier if he pled guilty than he would if he stood trial and was convicted.

"No evidence was introduced in the habeas corpus hearing tending to establish that such an opinion by petitioner's counsel was not justified, although it was established that the board of parole does not have a formal policy of automatically granting earlier parole to those who plead guilty than is granted to those who are convicted upon trial.

"In all respects, petitioner was represented by effective counsel.

"Petitioner's plea of guilty was entirely voluntary, and was not induced by any threats or promises."

 There is ample support in the record for the trial court's findings.

IV. Petitioner's claim of improperly induced plea of guilty falls of its own weight under his own testimony quoted in Division III, supra. It need not be separately discussed.

V. The trial court's findings are supported by the record. We find no error in the court's conclusions. There was no lack of jurisdiction in the court entering the judgment under which petitioner is restrained. There was no showing of any violation of constitutional rights entitling petitioner to relief in habeas corpus.

The case is

Affirmed.

All Justices concur.